

FILED

MAR 23 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

In re:                                    ) Case No. 09-34525-C-7
                                          )
DARYL ROGERS and MONICA E.                ) Adversary No. 09-2643
ROGERS,                                   )
                                          )
                    Debtor(s).            )
_____)
                                          )
HOWARD PATTERSON,                         )
                                          )
                    Plaintiff(s),         )
                                          )
v.                                        )
                                          )
DARYL J. ROGERS,                          )
                                          )
                    Defendant(s).         )
_____)

**RESTATED AND CORRECTED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In addition to the findings of fact and conclusions of law made on the record 13 December 2010, as amended on the record 27 January 2011 (transcripts attached as Exhibits A and B, respectively, and incorporated by this reference),

THE COURT FINDS AND CONCLUDES:

1. That plaintiff Howard Patterson has established the elements of fraud by a preponderance of evidence:

      (a) Defendant Daryl J. Rogers misrepresented to plaintiff that, to correct the legal description, it was necessary for plaintiff to release the mortgage originally granted to him to secure the note of Gridiron Development LLC, dated May 27, 2005 (Trial Exhibit P26);



(b) Defendant knew that his representation that
it was necessary to release a mortgage to
correct its legal description was false;

(c) Defendant intended to deceive plaintiff;

(d) Plaintiff justifiably relied on the
representation of defendant and executed the
release dated July 27, 2005 (Trial Exhibit
P91);

(e) Which proximately caused damage to
plaintiff via his loss of priority in the
collateral;

2. It has not been established that defendant Daryl J.
Rogers knew the legal description needed no correction, or that
an encumbrance in favor of another party would be recorded before
the purportedly corrected new mortgage of plaintiff would be
recorded;

3. Defendant Daryl J. Rogers is liable to plaintiff Howard
Patterson for the resulting diminution in value of plaintiff's
security for the Gridiron Development LLC note, and that
liability is NONDISCHARGEABLE pursuant to 11 U.S.C.
§ 523(a)(2)(A);

4. All other debts owed by defendant to plaintiff were
discharged by the discharge granted 2 November 2009; and

5. Except as modified above, the findings previously made
and set out in Exhibits A and B are unchanged.

Dated:   March 23, 2011.

_____
PHILIP H. BRANDT
UNITED STATES BANKRUPTCY JUDGE

- 2 -

1

**CERTIFICATE OF SERVICE**

2

    On the date indicated below, I served a true and correct
copy(ies) of the attached document by placing said copy(ies) in a

3

postage paid envelope addressed to the person(s) hereinafter
listed and by depositing said envelope in the United States mail

4

or by placing said copy(ies) into an interoffice delivery
receptacle located in the Clerk's Office.

5

6

William C. Neasham II

Patricia Kramer

7

11201 Gold Express Dr #202
Gold River, CA 95670

8

9

Brett E. Rosenthal
1517 Lincoln Way

10

Courthouse Plaza
Auburn, CA 95603

11

12

Larry J. Cox
PO Box 568

13

Rocklin, CA 95677

14

Dated:

15

3/24/11

16

DEPUTY CLERK

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**Transcript 13 December 2010**

FILED

February 03, 2011

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003257192

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA


IN THE BANKRUPTCY OF:                )
                                     )
HOWARD PATTERSON                     )
                                     )
vs.                                  )
                                     )   CASE NO. 09-34525-P-7
DARYL ROGERS                         )
                                     )
                                     )
_____)


---oOo---


AMENDED REPORTER'S TRANSCRIPT OF PROCEEDINGS
Held at the United States Courthouse, Sacramento,
California, on

December 13, 2010


Before the HONORABLE PHILIP H. BRANDT, Judge thereof.


---oOo---


APPEARANCES

For the Plaintiff:   LAW OFFICES OF NEASHAM & KRAMER
                     BY:  PATRICIA KRAMER, Esq.
                     11201 Gold Express Drive, Suite 202
                     Gold River, Ca  95670


Reporter By:         Denise Hansen, CSR No. 11153


DIAMOND COURT REPORTERS
1107 2nd Street, Suite 210
Sacramento, CA  95814
916-498-9288

EXHIBIT A

1  SACRAMENTO, CALIFORNIA; MONDAY, DECEMBER 13, 2010;

2                      1:30 P.M.

3       JUDGE BRANDT:  So that then brings us to

4  Patterson vs. Rogers.

5       So we'll note that we have -- with respect to

6  Mr. Patterson, he is here, as well as Ms. Kramer and

7  Mr. Neasham.  With respect to Mr. Rogers, both Mr. Cox

8  and Mr. Rosenthal are present.

9       MR. NEASHAM:  Good morning, your Honor.

10      MS. KRAMER:  Good afternoon.

11      JUDGE BRANDT:  Good afternoon.  I don't feel so

12  bad for having come in on the wrong side of the

13  courtroom now.

14      This has been a long show for everybody concerned.

15  I think we are at an end. This is my ruling after

16  trial in Patterson vs Rogers, Eastern District of

17  California, Bankruptcy No. 09-2643-C.

18      The trial was held the 8th through the 12th of

19  November of this year.  And in that trial Mr. Howard

20  Patterson claims that Daryl Rogers, the debtor in the

21  Eastern District of California No. 09-34525, is

22  indebted to him for fraud in connection with two

23  releases of security for a note given by Gridiron, LLC

24  to him, which was part of the purchase price for some

25  property in Loomis, California known as Heritage Park

1  (I may refer to it either way as we go on) which

2  Gridiron purchased from him in 2005.

3      That transaction arose out of an earlier purchase

4  and sale agreement which was initially signed by Mr.

5  Rogers as purchaser.  And my recollection is even the

6  original agreement provided for the possibility that

7  some other individual or entity would be the person

8  actually taking title.

9      The trial was, by the prior ruling of Judge Klein,

10  on the issue of non dischargeability, with the amount

11  of any liability to be determined in the state court

12  action which is pending in Placer County.

13      I note that although this is a joint bankruptcy, and

14  Monica Rogers is also a debtor; the only defendant in

15  the adversary proceedings is, Mr. Rogers -- so we don't

16  need to address possible questions of community

17  liability, in the event of a nondischargeability.

18      The dispositive question is whether Mr. Rogers

19  committed fraud in connection with two releases of

20  security; one in 2005 and one in 2007.  And they both

21  are security in buildings A, B and E in the West Towne

22  Development in Ames, Iowa.

23      I have considered the evidence -- the testimony

24  that was taken on the admitted exhibits, and the facts

25  that are set forth in the joint statement that was

1  filed sometime earlier -- I believe that is Exhibit 158

2  or 3.  (My notes are hard to read.)

3      The standard of proof is a preponderance of

4  evidence, and, of course, with respect to testimony I

5  have considered the credibility of the parties.

6      To establish nondischargeability under 523(a)(2)(A)

7  the plaintiff has to establish five elements as a said

8  by a preponderance of the evidence:  That there was a

9  misrepresentation, fraudulent omission or deceptive

10  conduct; that the debtor had knowledge of the falsity

11  or deceptiveness of his statements or conduct; that he

12  had attempted to deceive; that there was justifiable

13  reliance on the statement by the creditor and --

14  statement or conduct; and that the damages to the

15  creditor proximately resulted from that statement or

16  conduct.  That was most recently set forth or -- one of the

17  most recent statements of that set of principles is in

18  re:  Sabban 384 Bankruptcy Reporter 1, Ninth Circuit

19  BAP.  That is a case from 2008, citing in re: Slyman,

20  234 Federal 3rd 1081, a Ninth Circuit case from 2000.

21  And, of course, its hornbook law that we construe

22  nondischargeability statutes strictly in favor of the

23  debtor.

24      Taking the two instances, the two releases, in

25  reverse order.  Regarding the 2007 release, I do not

1 find fraud.  Mr. Patterson agreed to Mr. Rogers'

2 proposal to release his security position on the

3 buildings in the West Towne Development in Iowa for

4 substitute security in Mr. Rogers' house, his interest

5 in the Keller Williams Auburn real estate entity, which

6 was held via some entities that he owned, and the

7 position on a mortgage on the Heritage Park property in

8 Loomis.

9       He did sign -- Mr. Patterson did sign a release on

10 the West Towne buildings, but then tried to stop the

11 transaction when he found out that he'd be in third

12 position on the Heritage Park property rather than

13 junior only to -- I believe it was Umpqua Bank.

14       But that highlights that there was no clear

15 agreement at -- or at least no testimony of a clear

16 agreement -- as to the precise nature of the security

17 position on Heritage Park.

18       Mr. Patterson's testimony, including that in his

19 alternate direct testimony that was admitted -- that

20 was done and prepared at a time not under pressure --

21 that he understood that he'd be in second or have a

22 second position on that property.  There is no specific

23 representation set forth that Mr. Rogers said "you will

24 be in second on this property."

25       The lack of the other security, the lack of the

1  junior deed of trust on the Rogers' house or some sort

2  of assignment of transfer of security interest in the

3  ownership entities or what Mr. Rogers owned of the

4  ownership entities isn't what caused the transaction to

5  stop there.  It was the security position with respect

6  to Heritage Park.

7      So I conclude that there is no false

8  representation established, because I don't find any

9  representation of the state of the security position

10 that Mr. Patterson was expecting to get.

11     Parenthetically, I'm somewhat skeptical of damages

12 established at that point because of the real estate

13 meltdown and the measure of damages, which would be the

14 value of the security position on West Towne -- on the

15 West Towne buildings at that time, which would seem --

16 at least from the other testimony -- to be questionable

17 at best.

18     But that is not what was before me in this trial.

19 So if it were to turn out that that position had some

20 value at that time there would be damages.  That

21 wouldn't obviate the need for establishing

22 misrepresentation, which I conclude has not been done

23 in that instance.

24     With respect to the 2005 release shortly after

25 closing, this is somewhat more difficult.  The release

1    was purportedly required to correct a legal description

2    that was contained in the first mortgage given to Mr.

3    Patterson -- not necessarily the first mortgage on the

4    buildings -- but the one that was given to him in

5    connection with the closing on Heritage Park.

6         He signed a release.  There was a new mortgage

7    prepared, the second one from -- I believe it was Eller

8    Development at that point.  The legal description

9    didn't change.

10        The effect of that transaction, however, was to

11   put Mr. Patterson's mortgage on those three buildings

12   behind an intervening mortgage to a bank -- and I would

13   say here parenthetically -- it was not established that

14   that was the only -- that there was no pre-existing

15   mortgage in favor of the bank.

16        Mr. Eller testified there was never a time when

17   there wasn't some overall security or position held by

18   a bank on the West Towne development and it was never --

19   never established, in the course of the trial, what

20   was the comprehensive security position over time in

21   those buildings in West Towne.  There was no title

22   report or expert opinion report from Iowa counsel about

23   what the status of the security was at the relevant

24   times.

25        We do know, however, that Mr. Patterson was -- had

1  a mortgage, released it, got a new mortgage, and in

2  between there was a mortgage to the bank, which pretty

3  dramatically reduced his security position.

4      Mr. Patterson says he was told this was to correct

5  the legal description by Mr. Rogers.  Mr. Rogers said

6  that wasn't part -- says -- testifies that wasn't his

7  role in the process, and he's referred questions like

8  this to Mr. Eller in Iowa and his employees and various

9  entities -- Mr. Eller.

10      Just on the demeanor of the two witnesses at

11  trial, it's hard to say that one is more credible than

12  the other in the description of their interactions.

13  And that would not normally be sufficient to carry a

14  plaintiff's burden of proof.  An even balance is not a

15  preponderance of the evidence.

16      But there is a complicating factor, and that's

17  Mr. Rogers' status as a licensed real estate agent in

18  California, and as the de facto broker of Keller

19  Williams, Auburn and the trainer of other realtors:

20  Did he know that correction and rerecording or separate

21  amendments referencing the previously recorded mortgage

22  could correct the legal description without affecting

23  the priority of Mr. Patterson's mortgage.

24      Lawyers and probably law students who have a year

25  of property would probably expect that is the case.

1  Certainly my initial reaction to the testimony was

2  considerable skepticism on that point, and also what

3  appeared to be a somewhat casual approach to

4  documentation in the use of different entities, not

5  just by Mr. Rogers but also by Mr. Eller, who, of

6  course, is not a defendant here.

7      But there is no evidence of what someone needs to

8  know to be licensed in California about how to correct

9  a legal description, nor anything about what Mr. Rogers

10  taught other realtors about that question, that point,

11  when he was teaching the other Keller Williams Realtors

12  about various things, nor is there any direct evidence

13  about Iowa law on this point, although I think we all

14  assume that it parallels California.

15      Considering all that though, I conclude that it

16  has not been established that Mr. Rogers knew that the

17  falsity of the representation that was -- that the

18  release and then a new mortgage would be necessary to

19  correct the legal description.

20      And I conclude that fraud is not established in

21  connection with the first release.

22      So I will grant judgment for defendant Daryl

23  Rogers.  Because of the possibility of a reversal on

24  appeal -- and these are very difficult issues and there

25  is a lot involved -- I'm going to address some other

1 issues in hopes of obviating any need of a retrial if

2 there is a reversal.

3 　　First, in connection with the 2005 release, it was

4 a misrepresentation.  I'm again assuming that Iowa law

5 parallels California law; that there was no necessity

6 for the release and then a new mortgage to correct the

7 legal description.

8 　　Second, Mr. Patterson's reliance on Mr. Rogers'

9 statements was justifiable.  He was functioning in a

10 broker status, treated as a broker and looked to as a

11 broker in Keller William's Auburn office; in the same

12 offices which his own individual agent was working.

13 And so I would say, to the extent Mr. Patterson relied

14 on Mr. Rogers' statements, that was reasonable.

15 　　And, as I indicated before, Mr. Rogers was

16 proximately damaged by the extent of the reduction in

17 value of his collateral in the West Towne buildings at

18 that time.

19 　　I don't find Mr. Rogers' ownership or not of

20 building E at the time of the initial transaction

21 material.  What matters was the value of the

22 collateral, at least in terms of what might not be non

23 dischargeable the building or the collateral itself

24 minus any prior encumbrances.

25 　　With respect to the -- for lack of a better

1  term -- the leftover parcel in West Towne, which was

2  created at the time of the ultimate short sale.  I

3  don't believe that Mr. Rogers misled anybody or

4  intended to mislead anybody in connection with the

5  bankruptcy filing by not scheduling an interest there.

6       To the extent he may still have an interest or the

7  Rogers, plural, may still have an interest, there may

8  be a title problem in Iowa, and there technically may

9  be a one-seventh interest there -- an undivided

10 interest that still is in the name of the Rogers.

11      But I find him credible in saying that he thought

12 that he parted with all his interest in Iowa when he

13 signed off on the short-sale documents and forwarded

14 the quitclaim deed.  The fact that it didn't ultimately

15 get recorded is not something that he had control over.

16      Finally, I think I may have said this before but

17 it seems to me that the measuring of damages in either

18 instance for the release is the value, if any, of the

19 collateral that was released at the time rather than

20 the face amount of the note.

21      And I think that concludes my ruling.  Very

22 difficult case.  I know this is very hard for all

23 concerned, but that is my best shot at it.

24      MS. KRAMER:  Thank you.  Just one question for the

25 record.  When you were rendering your ruling you said

1   that you did find that Mr. Rogers had a devaluation

2   when the first release was made and I think you meant

3   to say Mr. Patterson.

4       JUDGE BRANDT:   Correct.   Right.   Mr. Patterson was

5   releasing security.   So if there is any -- to the

6   extent that his security was worsened by that bank

7   mortgage, that seems to me to be an appropriate measure

8   of damages there.

9       We'll be in recess.

10      MS. KRAMER:   Thank you very much.

11     (Proceedings were concluded at 2:05 p.m.)

12

13                ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

1    REPORTER'S CERTIFICATE

2

3    STATE OF CALIFORNIA        )

4                              )

5    COUNTY OF SACRAMENTO       )

6

7         I, DENISE HANSEN, certify that I was the official

8    Court Reporter, Pro tem, and that I reported in

9    shorthand writing the forgoing proceedings; that I

10   thereafter caused my shorthand writing to be reduced to

11   typewriting, and the pages numbered 1 through 12,

12   inclusive, constitute a complete, true and correct

13   record of said proceedings:

14        COURT:   Sacramento Bankruptcy Court.

15        JUDGE:   The Honorable PHILIP H. BRANDT

16        CASE:    Patterson vs. Rogers.

17        DATE:    December 13, 2010.

18        IN WITNESS WHEREOF, I have subscribed this

19   certificate in Sacramento, California, on the 27th day

20   of December, 2010.

21

22

23        _____

24            DENISE HANSEN, CSR No. 11153

25

# EXHIBIT B

**Transcript 27 January 2011**

FILED

February 17, 2011

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003289072

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA


IN THE BANKRUPTCY OF:          )
                               )
DARYL AND MONICA ROGERS,       )    Case No. 09-34525-P-7
                               )
              DEBTORS.         )
_____)
HOWARD PATTERSON,              )    Adv. No. 09-2643-C
                               )              LJC #3
          PLAINTIFF,           )              WCN #5
                               )
VS                             )
                               )
DARYL ROGERS,                  )
                               )
_____DEFENDANT._____)


---oOo---

Reporter's transcript of proceedings held at the

United States Courthouse, Sacramento, California, on

THURSDAY, JANUARY 27, 2011

Honorable Philip H. Brandt, Presiding

---oOo---


Reported by:  Patricia A. Hernandez, CSR #6875


DIAMOND COURT REPORTERS
1107 2nd Street, Suite 210
Sacramento, CA  95814
916-498-9288                    EXHIBIT B

```
 1                    A P P E A R A N C E S

 2

 3  FOR THE DEBTORS:    LARRY J. COX
                        Attorney at Law
 4                      P.O. Box 568
                        Rocklin, California  95677
 5                      8150 Greenback Lane, Bldg. 200
                        Fair Oaks, California  95628
 6
                        BRETT E. ROSENTHAL
 7                      Attorney at Law
                        Frank Law Group
 8                      1517 Lincoln Way
                        Auburn, California  95603
 9                      (530) 887-8585

10

11  FOR THE CREDITOR:   PATRICIA KRAMER
                        MR. NEASHAM
12                      Attorney at Law
                        NEASHAM & KRAMER
13                      11201 Gold Express Drive, Suite 202
                        Gold River, California  95670
14                      (916) 853-8030

15

16

17

18

19

20

21

22

23

24

25
```

1                      ---oOo---

2              THURSDAY, JANUARY 27, 2011

3                    PROCEEDINGS

4                      ---oOo---

5        THE COURT:  Please be seated.  My apologies for the

6   modest delay here, and I suppose it's not good for someone

7   from Seatle to comment on the lack of sun but I did notice

8   it.

9        This is Patterson V. Rogers, Eastern District of

10  California Adversary Number 09-2643-C.  I'll note that

11  Mr. Patterson is present with his counsel Mr. Nisham and

12  Miss Kramer, and that Mr. Cox and Mr. -- I'm sorry.

13       MR. ROSENTHAL:  Rosenthal.

14       THE COURT:  Rosenthal.  Well, I was doing pretty

15  well.  They are present.

16       MR. ROSENTHAL:  No offense taken, your Honor.

17       THE COURT:  Anyway, I previously made findings and

18  conclusions on the record on the 13th of December of last

19  year, and those remain my findings and conclusions except

20  as may be modified or supplemented today.  I am going to

21  address the issues basically in the same order as I did in

22  that ruling.

23       With respect to the 2007 releases, I am not inclined

24  to change my ruling.  First Mr. Patterson's testimony was

25  that he was told, quote, "they --" referring to the

1  properties, "-- were going into foreclosure."  Not that they

2  were, in fact, then being foreclosed upon.  That's found at

3  the top of page 35 of the partial transcript attached to

4  Miss Kramer's declaration in support of the motion as

5  Exhibit B.  Second, the evidence doesn't establish the

6  representations made by Mr. Rogers with sufficient

7  proceeding for me to determine whether they were falsely

8  made.

9        On the point of the prior RT that Mr. Patterson would

10  have an issue, Heritage Park, that I previously noted and

11  whether or not the additional security, the junior mortgage

12  on the Rogers' home and the pledge of the ownership interest

13  in the real estate operation were merely placeholders

14  security pending the Heritage document or documentation or

15  not, I take "placeholders security" to mean temporary until

16  the documentation was done.  There is conflicting testimony

17  on those points, and the testimony comes from the two of

18  them with roughly equivalent credibility.  I can't find that

19  Mr. Patterson has proven his case with a preponderance of

20  the evidence.

21        Again, the 2005 release is more difficult.

22  Credibility was the central point or the central issue in

23  that, in my prior ruling and it remains so today.  Everybody

24  who testified at trial, either directly or through the

25  depositions that were admitted, testified consistently with

1 | that person's own interests.  That's pretty standard human

2 | nature but it does color memory recollection.

3 |     So what tips the balance, if anything?  What creates

4 | the preponderance that Mr. Patterson needs to show to

5 | establish fraud in connection with that release?  I will

6 | say I have -- this has not happened that I can recall in the

7 | 20 years since I have been doing this or almost 20 years,

8 | but I'm going to change my ruling on fraud in connection

9 | with the 2005 release.

10 |     What changes that ruling?  What tips the balance?

11 | Mr. Patterson signed the purchase and sale agreement and the

12 | first addendum, Addendum 1 on the 7th of May, 2005.

13 | Thereafter there is a series of addenda, some numbered, some

14 | not, that take place before closing.  Addendum 1 changes the

15 | security for the note he was taking back to the West Town

16 | Project in Iowa.  2 and 3 extend the closing.

17 |     The unnumbered next addendum which is Exhibit 10, the

18 | 15th of June, designates the purchaser as Great Iron

19 | Development, LLC, and that is consistent with or tracks on

20 | the purchase and sale agreements listing the purchaser as

21 | Mr. Rogers or assigns.

22 |     4 and 5 extend payment on the notes.  There was

23 | another number 5, and that adds in the four lots that

24 | Mr. Patterson was originally going to retain under the

25 | original terms.

1          By in large all of these addendums benefit the

2    purchasing interest, not Mr. Patterson.  He gets partial

3    payment and gets the February payoff designated instead of

4    when the project is completed in return for ten dates and so

5    on, but it's pretty clear that he's not the fundamentally

6    the moving party in the addendums.  He is reactive, and he

7    has already got the February payoff in writing in one of

8    those addendums, and then he agrees to further adjustments

9    in later addendum.

10          So I do find now that the purported need to correct

11   the legal description in Eller mortgage to Mr. Patterson is

12   what led to his release of the initial mortgage securing

13   his carryback note.  There is considerable conflict in the

14   testimony about who made that request of Mr. Patterson, and

15   it's not just between Mr. Patterson and Mr. Rogers, it's

16   between Mr. Rogers and Mr. Eller and Mr. Eller's employees.

17          Sorting through all of this I conclude that

18   Mr. Rogers was the one who made the request.  I'm not

19   finding that Mr. Rogers knew that there was no need to

20   correct the legal description or that he knew that there

21   was a new mortgage to Midwest Bank in the offing, just

22   that he conveyed that request to Mr. Patterson.

23          It may well be that the true culprit here is

24   Mr. Eller or someone in his organization, but that is beyond

25   the scope of the adversary proceeding and is not in my

1  jurisdiction now to determine.  All that said, Mr. Rogers

2  made a misrepresentation to Mr. Patterson that a release was

3  necessary to correct the legal description.

4         The linchpin of my initial judgment that Mr. Rogers

5  had not committed fraud on Mr. Patterson in connection with

6  the 2005 release was that it had not been shown that

7  Mr. Rogers knew that that representation, the need to

8  release and do a whole new document and to correct the legal

9  description was false; but the language quoted on page 9 of

10 the transcript of my ruling on that point found at page 9,

11 lines 5 through 15 of the transcript of my 13th of December

12 ruling.

13        That linchpin is removed and the wheel comes off with

14 Mr. Rogers's trial testimony regarding the 2007 release

15 quoted in the Points and Authorities in support of this

16 motion at page 11, that a release is not necessary to modify

17 a real property security instrument.  I know that that

18 question, the question to Mr. Rogers at that point was not

19 precisely on.  In precisely an equivalent situation it

20 really relates to the 2007 release and in shifting security

21 to the Heritage Park property rather than adjusting the

22 instrument on the Iowa property, but it does show that

23 Mr. Rogers knows, and I don't see any reason to believe that

24 if he knows it now he didn't know it then, that a real

25 property security position can be modified, and a correction

1 is a form of modification without releasing the original

2 security.

3     So I will find that the knowledge of falsity element

4 under Section 523(a)(2)(A) of the Bankruptcy Code has been

5 established by a preponderance of the evidence, and that

6 completes the proof required for nondischargeability under

7 Section 523(a)(2)(A) with respect to the 2005 release.

8     That conclusion requires that I address the damages

9 question.  Although that issue will ultimately be resolved

10 by the State Court, I remain of the view that as the fraud

11 relates to the release of the security, not the underlying

12 transaction, the appropriate measure of damages,

13 nondischargeable damages, if any, is that any issue in value

14 of Mr. Patterson's security position caused by the release

15 and his loss of priority.  I don't believe that there has

16 been any authority cited to the contrary that is at all

17 persuasive, and I stand on my prior finding that the prior

18 order of Mr. Patterson's security position in West Town, the

19 Iowa property, has not been established.

20     Exhibit 113 which is referenced in the moving papers

21 and by Mr. Patterson lists the encumbrances on the West Town

22 properties as of November of 2007.  They don't tell us what

23 those were in July of 2005.  It doesn't tell us what those

24 were in July of 2005, and nothing else in evidence does.

25     I can't determine from any evidence that has been

1 admitted whether the Midwest Bank mortgage was a full or

2 partial take out of some prior encumbrant or the renewal of

3 a prior encumbrance.  I'm not saying that it was one of

4 those things, but I just can't tell one way or the other.

5 So that's an open question and presumably will need to be

6 sorted out in connection with establishing the amount of

7 damages.

8       So these findings in conclusion supplement and modify

9 those I made on the 13th of December, and I'll prepare an

10 amended judgment.

11       Having made that ruling, the Defendant's motion for

12 .fees and costs seems to me to be moot but I suspect one may

13 .be forthcoming from Mr. Patterson, and so I need to

14 elaborate on something that was puzzling me about that

15 .motion before I had sorted through everything and reached a

16 conclusion I just laid out for you.

17       It's far from clear to me that the attorney fee

18 provision in the purchase and sale agreement comprehends

19 this adversary proceeding.  The purchase and sale agreement

20 was fully performed.  Mr. Patterson would have the same

21 cause of action if when the parties initially commenced

22 dealing he already had the Iowa security and he was

23 convinced to release that security to correct a legal

24 description.  I don't see how it arises out of the purchase

25 and sale agreement.

1    Xuereb -- I guess that's how I pronounce this case --

2  Xuereb involved dealing in connection with the instruments

3  itself, not subsequent activities respecting the fruits of

4  the transaction, and so it seems to me that it's very

5  doubtful -- well, it seems I am not "persuaded" I guess

6  would be a better way to put it, that that adversary

7  proceeding, the fees can be recovered in an adversary

8  proceeding based on the attorney's fee provision in the

9  purchase and sale agreement.  Go back and look at it.

10  There's an attorney fee provision in the Iowa mortgages and

11  the carryback note, but I don't think Mr. Rogers signed

12  those; and I don't think I have heard about any guarantees,

13  so I'm not sure that that would work.

14      I would also point counsel to a BAP case, In Re:

15  Davison.  I think it's D-a-v-i-s-o-n, 201 Bankruptcy

16  Reporter, 2916, a BAP case from 2003 which it is a somewhat

17  similar situation it seems to me.

18      So those by way of saying that if there is a motion

19  for fees coming from the Plaintiff, that we will need to

20  have that briefed, and I think that concludes my ruling for

21  today.

22      Questions?  Comments?  Mr. Neasham.

23      MR. NEASHAM:  I have a question, your Honor.  I think

24  the Court has already ordered the debt dischargeable, or at

25  least a judgment to that effect I believe was entered

1  shortly after yours.

2       THE COURT:  Well, I think that -- right.  I'm going

3  to go on amended judgment.

4       MR. NEASHAM:  All right.  That is --

5       THE COURT:  If I didn't say that already, I meant to.

6  We will do an amended judgment.  With luck we'll have it

7  done today.  It may not hit the docket until tomorrow.

8       MR. NEASHAM:  I was curious as to whether the

9  Court --

10      THE COURT:  As a practical matter the pending motion

11 for reconsideration kind of put that --

12      MR. NEASHAM:  As stated or whatever the right words

13 are?

14       THE COURT:  Yes.

15      MR. NEASHAM:  Right.  I didn't hear the Court say it

16 was going to amend its judgment.

17      THE COURT:  Well, I intended to.  So what I'm going

18 to do is I'll order that denies -- or that grants the motion

19 for reconsideration in part for these reasons, do an amended

20 judgment that includes these, includes the findings from

21 December 13th as modified by the findings today and finds

22 that the debt is nondischargeable, and I'm pondering whether

23 or not to include -- I'm thinking I will include a brief

24 description to the extent of what might be nondischargeable

25 just in case this gets either in evidence in the state court

 1   trial or comes up in the state court trial, and that way you

 2   don't need to sort through transcripts to give the state

 3   court judge.  It should all be in one place.  Then I think

 4   as far as the motion for fees, I'll simply just strike it as

 5   moot.

 6        MS. KRAMER:  I have another procedural question, your

 7   Honor.

 8        THE COURT:  Sure.

 9        MS. KRAMER:  With this, with the entry of this

10   amended judgment, would it contain procedural language that

11   would indicate to the state court that the matter would be

12   remanded, that the matter --

13        THE COURT:  Was it not already a relief from stay to

14   let the state court --

15        MS. KRAMER:  No, your Honor.  That's why I did the

16   trial.

17        THE COURT:  Oh, okay.  I thought that was going on in

18   parallel under a relief from stay, and that was something

19   that I thought happened while Judge Klein was handling this

20   case.

21        MR. ROSENTHAL:  I think that --

22        THE COURT:  I don't think I want to put it in the

23   judgment proper, but I think it would be appropriate to have

24   an order that that remands the damages question to the state

25   court.

1      THE COURT:  Yeah.

2      MR. NEASHAM:  -- lift that.  So maybe an order, a

3 separate order --

4      THE COURT:  Yeah, and relief from stay is not really

5 technically correct at this point anyway because there has

6 already been an discharge as to pretty much everything else.

7      MR. NEASHAM:  Right.

8      MR. ROSENTHAL:  And to the degree that the Court is

9 going to include language referring or addressing the

10 damages issue for the state court's guidance, it would seem

11 to me that a simple -- that implicit in that matter remand

12 isn't the proper response in an order because --

13      THE COURT:  Maybe what I should do is just put in the

14 order that as -- I mean addressing the scope of damages to

15 simply say for determination by the start court.

16      MR. ROSENTHAL:  Yes, according to whatever

17 considerations.

18      THE COURT:  So I don't think that screws up a

19 judgment with the extemporaneous language but it probably

20 means that we don't need to have a separate order to do

21 that.

22      MR. NEASHAM:  Your Honor, where the state court was

23 tangled up, though, that's why I was suggesting a separate

24 order.  They view the automatic stay provides there is no

25 order for relief there.

 1      THE COURT:  Right.

 2      MR. NEASHAM:  Then they -- the state court action is

 3 not really preceded because there is the stay provision.

 4 That is why I was suggesting a separate order in addition to

 5 the amended judgment because that will at least be something

 6 that we can show to the state court and say this --

 7      THE COURT:  Well, maybe what I should say is

 8 something that it's just a cure to the fact that the

 9 extended that relief from stay or modification of a

10 discharge injunction is necessary, permitted to do so, it's

11 done.

12      MR. ROSENTHAL:  I think --

13      MS. KRAMER:  Right.

14      MR. NEASHAM:  Something because they are not that

15 conversant with bankruptcy matters other than --

16      THE COURT:  I'm not that conversant with State

17 criminal law.

18      MS. KRAMER:  Right.  And what has been occurring in

19 the state court action is, although it's gone on with

20 respect to the other defendants, the Court continues to just

21 continue the status conferences pending the outcome of this.

22      THE COURT:  Okay.  Well, we will try to -- I think --

23      MR. ROSENTHAL:  And --

24      THE COURT:  Let me say this, I will take a cut at it,

25 and you know, if it turns out that it's still too puzzling

1  or ideally counsel can agree on that it ought to be changed,

2  if it ought to be changed to clarify that issue, let me know

3  through the court, but I think I probably can do it in a way

4  that is clear enough so it won't require further back and

5  forth to get something that makes it clear.

6       MR. COX:  Mr. Rosenthal is counsel for Mr. Rogers in

7  the state court action, so I suspect he will be able to

8  speak to this issue directly so that the confusion should be

9  minimized.

10      THE COURT:  Right.  Well, I suspect -- I think I

11 would like just on the Court's behalf to order out a

12 transcript of the ruling.  So let's just do that so that you

13 will have that as well and including this colloquy so

14 it's -- I want it real clear that we are all expecting, I'm

15 expecting the state court to go ahead and do damages at this

16 point in connection with whatever else it's doing in that

17 allegation.

18      MS. KRAMER:  Thank you so much, your Honor.

19      MR. COX:  But to do that consistent with your ruling;

20 correct, your Honor?

21      THE COURT:  Well, it may need to -- as far as

22 Mr. Rogers and what is nondischargeable, yes.  As far as any

23 other party or --

24      MR. COX:  Right.

25      THE COURT:  -- or whether or not for the purpose of

1  getting some assurance or something like that, there is a

2  need to say that Mr. Rogers was, you know, apart from

3  bankruptcy would be liable for fraud in some larger amount

4  or some other cause of action in some larger amount.  I

5  have a problem with the state court making maybe findings

6  to that effect but I want it -- but as far as what is

7  nondischargeable, that is all.  Everything else is

8  discharged.  That's why I don't think -- it doesn't seem to

9  me it ought to matter to Mr. Rogers.  I mean other than in

10  a technical legal sense it ought not matter to Mr. Rogers if

11  he would be found liable for a greater amount for some other

12  reason, but obviously he would rather not, I'm sure, just as

13  a matter of --

14      MR. COX:  As a practical matter that's probably true.

15      THE COURT:  Okay.

16      MS. KRAMER:  We appreciate you coming down, your

17  Honor.  Thank you very much.

18      THE COURT:  Thank you all.  We will be in recess.

19              ---oOo---

20      [Whereupon proceedings concluded.]

21              ---oOo---

1              CERTIFICATE OF SHORTHAND REPORTER

2

3  STATE OF CALIFORNIA     )
                           )

4  COUNTY OF SACRAMENTO    )

5

6            I, Patricia A. Hernandez, a Certified Shorthand

7  Reporter licensed by the State of California, do hereby

8  certify that I am a disinterested person herein; that I

9  reported the foregoing hearing verbatim in shorthand

10  writing; and that I thereafter caused my shorthand writing

11  to be transcribed into typewriting.

12

13           I further certify that I am not of counsel or

14  attorney for any of the parties to said hearing, or in any

15  way interested in the outcome of said hearing.

16

17           IN WITNESS WHEREOF, I have hereunto set my

18  hand this 9th day of February, 2011.

19

20

21                         _____

                           Patricia A. Hernandez

22                       Certified Shorthand Reporter

                         License Number 6875

23

24

25